UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

HAROLD S. WHITE,
Executor of the Estate of
ANDREW R. WHITE and
SHIRLEY WHITE

       Plaintiffs,

v.                             Civil Action No. 2:08-978

AMERICAN GENERAL LIFE
INSURANCE COMPANY,

       Defendant.


MEMORANDUM OPINION AND ORDER


       Pending are the motion for summary judgment of the defendant, American General Life Insurance Company ("American General"), filed on July 10, 2009, and the motion for partial summary judgment of the plaintiffs, Harold and Shirley White, seeking declaratory judgment, filed on July 13, 2009.  Harold and Shirley White are the parents of the decedent, Andrew R. White.[1]

_____

      [1] While the caption of the complaint includes Harold S. White as the executor of the estate of Andrew R. White, the body of the complaint refers to Harold White as a plaintiff in his individual capacity.  (Compl. ¶ 1).  The allegations contained in the complaint further indicate that Mr. White is pursuing this action in his individual capacity and that is how he is treated in the parties' briefing on the motions for summary judgment. For purposes of this memorandum opinion and order, the court proceeds under the assumption that Harold White is suing in his individual capacity and not as the executor of Andrew White's

1

I.


At some point prior to, or on, October 27, 2006, Shirley White called American General insurance agent Cecil Eller and informed him that she was interested in purchasing "additional insurance" and that her son was considering purchasing a life insurance policy.  (Shirley White Dep. at 15, Mem. in Supp. Partial Mot. Summ. J., Ex. C).  In response to the call, Mr. Eller went to Mrs. White's place of employment where Mrs. White provided him with basic information about her then twenty-one year old son.  (Id. at 17-18).

On October 27, 2006, Mr. Eller met with Andrew at a car dealership where Andrew worked as a salesman.  (Id. at 16; Eller Dep. at 49-50, Mem. in Supp. Partial Mot. Summ. J., Ex. D).  During the meeting, Mr. Eller read Andrew questions from "Part A" of the American General "Life Insurance Application" and recorded Andrew's answers.  (Eller Dep. at 49, Mem. in Supp. Partial Mot. Summ. J., Ex. D; Application Part A, Mot. Summ. J., Ex. A).  Under the heading "Nonmedical Questions," question seventeen of Part A asks in pertinent part:

---

estate.

17. Background information *(Complete questions A through F for all proposed insureds who are applying. If yes answer apples to any proposed insured, provide details specified after each question.)*

. . . .

E. In the past five years, have any proposed insureds been charged with or convicted of driving under the influence of drugs or had any driving violations? *(If yes, list proposed insured's name, date, state, license no. and specific violation.)*    ☐ yes ☐ no

_____
_____

(Application Part A, Mot. Summ. J., Ex. A).  Andrew answered this question in the negative, and on the application a check is found in the box marked "no."  (Id.)

While Mrs. White had told Mr. Eller that Andrew did not use tobacco products, during the meeting Andrew corrected his mother and informed Mr. Eller of his use of smokeless tobacco, which Mr. Eller accordingly noted on Part A of the application. (Shirley White Dep. at 73, Mem. in Supp. Partial Mot. Summ. J, Ex. C; Eller Dep. at 50-51,Mem. in Supp. Partial Mot. Summ. J., Ex. D; Application Part A, Mot. Summ. J., Ex. A).  At the conclusion of the meeting, Andrew signed Part A of the application as the "primary proposed insured" and Mr. Eller signed as the "writing agent."  (Application Part A, Mot. Summ. J., Ex. A).

As part of the application process, on October 31, 2006 Andrew underwent a medical examination administered by Susan Camp, a "paramedical examiner." (Shirley White Dep. at 21, Mem. in Supp. Partial Mot. Summ. J, Ex. C; Camp Report, Mem. in Supp. Partial Mot. Summ. J., Ex. E; Eller Dep. at 66, Mem. in Supp. Partial Mot. Summ. J., Ex. D). On the same date, Andrew completed "Part B" of the American General "Life Insurance Application." (Application Part B, Mot. Summ. J., Ex. A).[2]

Question seven of Part B, titled "Personal Health History," provides:

> *Complete questions A through G for all proposed insureds who are applying. If yes answer applies to any proposed insured, provide details such as: proposed insured's name, date of first diagnosis, name and address of doctor, tests performed, test results, medications(s) or recommended treatment in the area provided.*

(Id.) Below this paragraph, questions 7(A)(8), 7(F)(3) and 7(G) ask:

> A. Has any proposed insured ever been diagnosed as having, been treated for, or consulted a licensed health care provider for:
>
> . . . .

---

[2] Plaintiffs assert, without factual support, that Ms. Camp read Andrew the questions contained in Part B of the application and filled in his answers. (Mem. in Supp. Partial Mot. Summ. J. at 3).

4

> 8) seizures, a disorder of the brain or
> spinal cord or other nervous system
> abnormality, including a mental or nervous
> disorder?
>
> . . . .
>
> F. In the past ten years, has any proposed insured:
>
> . . . .
>
> 3) been advised to have any diagnostic test,
> hospitalization or treatment that was not
> completed?
>
> . . . .
>
> G. Does any proposed insured have any symptoms or
> knowledge of any other condition that is not disclosed
> above?

(Id.)  As with question 17(E) of Part A, to the right of each of
these three questions there are two boxes, one marked yes and the
other no.  If any of the questions are answered in the
affirmative, the person filling out the application is directed
to provide an explanation in a space provided below the question.
Andrew answered questions 7(A)(8), 7(F)(3) and 7(E) in the
negative, and next to each of the questions the box marked "no"
is checked.  (Id.)

        At the end of Part B of the application, the following
statement is set forth:

> I have read the above statements or they have been read
> to me.  They are true and complete to the best of my

5

knowledge and belief.  I understand that this
application: (1) will consist of Part A, Part B, and if
applicable, related forms; and (2) shall be the basis
for any policy issued.  I understand that any
misrepresentation contained in this application and
relied on by the Company may be used to reduce or deny
a claim or void the policy if: (1) it is within its
contestable period; and (2) such misrepresentations
materially affects the acceptance of the risk.

(Id.)  Andrew signed his name below this statement as the

"primary proposed insured."  (Id.)  Ms. Camp also signed Part B

of the application as a "company representative" and as the

paramedical examiner who conducted Andrew's medical examination.

(Id.)

        On November 25, 2006, after receiving Parts A and B of

Andrew's application, American General issued Andrew life

insurance policy number UM003112L ("the policy") with a

"preferred tobacco" rating.  (Policy at 1, 3, Mot. Summ. J., Ex.

B; Yasso Dep. at 87, Mot. Summ. J., Ex. L).[3]  The policy provides

for an initial premium payment of $30.95 and periodic monthly

premium payments in the same amount.  (Policy at 3, Mot. Summ.

J., Ex. B).  Though there are certain exception, the policy

states that it cannot be contested "after it has been in force

_____

        [3] The policy defines "preferred" as meaning, "the cost of
insurance is based on the Insured being a better than average
maturity risk."  The word "tobacco" as used in the policy "means
the cost of insurance is based on the Insured being a user of
tobacco."  (Policy at 2, Mot. Summ. J., Ex. B)

during the Insured's lifetime for 2 years from the Date of Issue."  (Id. at 14).  In the event of Andrew's death prior to the maturity date of the policy in the year 2084, American General is to remit the sum of $50,000 to the policy beneficiaries, Harold and Shirley White.  (Id. at 1, 3; Application Part A, Mot. Summ. J., Ex. A).

On February 12, 2008, approximately one year and two and a half months after American General issued Andrew the policy, Andrew died in his parents' home at the age of 23. (Certificate of Death, Mot Summ. J., Ex. C; Shirley White Dep. at 71, Mem. in Supp. Partial Mot. Summ. J., Ex. C).  According to a certificate of death prepared by a West Virginia medical examiner, Andrew's death was accidental and caused by "combined methadone, paroxetine & quetiapine intoxication."  (Certificate of Death, Mot Summ. J., Ex. C).  During her deposition, Mrs. White explained that Andrew had served in Iraq as a member of the military and at the time of his death was taking medication to treat post-traumatic stress disorder.  (Shirley White Dep. at 71, Mem. in Supp. Partial Mot. Summ. J., Ex. C).  While plaintiffs make a number of unsupported assertions regarding the cause of Andrew's death, (Mem. in Supp. Partial Mot. Summ. J at 3), it appears as if the medication he was taking to treat his post-

7

traumatic stress disorder was a contributing factor.  (Id.;
Certificate of Death, Mot Summ. J., Ex. C).

        At some point prior to February 15, 2008, the Whites
provided American General with a "timely and appropriate notice
of Andrew R. White's death."  (Req. for Admis. # 4, Mem. in Supp.
Partial Mot. Summ. J., Ex. H).  On that same date, Michael
Machac, an American General senior claims examiner, sent the
Whites a letter on behalf of American General.  (Machac 2/15/08
Letter, Mot. Summ. J., Ex. D; Machac Dep. at 14, Mot. Summ. J,
Ex. I).  The letter advised them that the policy contains "a two-
year contestable claim period, which gives the Company the right
to review the information given at the time of the application if
a loss occurs within the first two years of the policy from the
date of issue or reinstatement."  (Id.)  The letter explained
that because Andrew's death,

      occurred during the first two years of the policy, it
      will be necessary to perform our routine review.  In
      order to accomplish this review, we have engaged Ed
      Edge with National Claim Resources to gather the
      required information.  Mr. Edge will be in touch with
      you in the near future.

(Id.; Machac Dep. at 10, Mot. Summ. J, Ex. J).

        As part of its investigation into the claim, American
General collected records and other information from medical

8

providers who had treated Andrew both before and after he applied

for the policy on October 31, 2006.  (Nat'l Claims Resources

Report, Mem. in Supp. Partial Mot. Summ. J., Ex. K; Machac Dep.

at 43, Mot. Summ. J, Ex. J).  These records included the notes of

Dr. Richard Hayes, a physician who treated Andrew on four

occasions in 2001, 2002 and 2003. (Dr. Hayes Notes 10/22/2001,

11/26/2001, 4/23/2002, 2/3/2003, Mot. Summ. J., Ex. G).  American

General also received an "emergency physician record" from Saint

Francis Hospital, where Andrew was treated for an injury to his

hand on April 2, 2002.  (Hospital Record, 4/2/2002, Mot. Summ.

J., Ex. G).

        Because Dr. Hayes' notes and the emergency physician

record contain handwritten entries which are difficult to

decipher, by order entered on August 13, 2009 the parties were

directed to file a joint stipulation setting forth the meaning of

the entries, or if they could not agree on the meaning, separate

statements setting forth their respective understandings of what

the entries say.  While American General has submitted a

statement setting forth its understanding of the handwritten

entries, plaintiffs have not.  Plaintiffs' response to the order

of the court entered on August 13, 2009 states that while

plaintiffs disagree with American General's understanding of the

handwritten entries, "[p]laintiffs are unable to state with
specificity and certainty what these illegible notes mean."
(Pls.' Resp. to 8/13/09 Order at 2).  The court has compared the
submission of American General with the handwritten entries
themselves and concludes that American General's understanding of
the handwritten entries is, in substantial part, correct.  The
court understands the notes of Dr. Hayes and the Saint Francis
emergency physician record to read as set forth in the following
four pages of summary.

          Andrew, approximately two months shy of his seventeenth
birthday, was examined by Dr. Hayes on October 22, 2001.
According to Shirley White, Andrew went to see Dr. Hayes because
his "very best friend had died suddenly" and he was having
difficulty coming to terms with the death.  (Shirley White Dep.
at 69, Mem. in Supp. Partial Mot. Summ. J., Ex. C).  In a section
titled "C/O," which presumably means "complains of," Dr. Hayes'
notes of the examination state,

> not eating breakfast or dinner - beginning of school
> year.  Denies abd cramping with eating - had restarted
> Benzaclin → been depressed/stressed felt anxious - Dad
> wants him to go to school - became aggressive/assertive
> Bitter in - erupt angry/rage at home.  Crying last
> night - emotionally upset over girl - who is a friend -
> ↓ energy.

(Dr. Hayes Notes 10/22/2001, Mot. Summ. J., Ex. G).  In the

10

section titled "PSYCH," Dr. Hayes inserted a checkmark next to the typewritten terms "alert & oriented X 3," "recent remote memory intact" and "affect appropriate." (Id.) Below these terms, Dr. Hayes wrote "(+) suicidal ideation." (Id.) Under the heading "ASSESS/PLAN" the notes read,

```
A: (1) Depression
   (2) acne
P: (1) Rec counseling
   (2) Zoloft 25 mg daily × 1 week; then 50 mg daily
   (3) Benzaclindamycin use daily
   (4) RT 1M
```

(Id.)

On November 26, 2001, Andrew was once again examined by Dr. Hayes. Dr. Hayes' notes of this examination provide, "f/u month feels better. Feeling ↓ overwhelmed. Talking to different girl more/some discussion anger management 2nd to agitation anxiety." (Dr. Hayes Notes 11/26/2001, Mot. Summ. J., Ex. G). In the section of the form titled "PSYCH" Dr. Hayes' wrote "mood better." (Id.) Under the heading "ASSESS/PLAN" the notes read,

```
A: Depression
   Acne

P: - Rec Benzaclindamycin
   - Cont Tetracycline - ↑ to 500mg BID
   - Cont Zoloft 50mg daily
   - Rec counseling
```

(Id.)

On April 2, 2002, Andrew was admitted to Saint Francis Hospital with an abrasion to his right hand.  (Hospital Record, 4/2/2002, Mot. Summ. J., Ex. G).  The "emergency physician record," which is signed by a nurse and not a physician, states that Andrew "c/o pain in (R) hand × 3 days.  Hit wall in anger. Swelling noted in (R) hand . . . slight bruising.  Released from ER in stable condition.  No acute distress noted @ this time." (Id.)  The record indicates that at the time he was admitted to the hospital, Andrew took the medications "Tetracycline" and "Zoloft".  (Id.)

On April 23, 2002, three weeks after his visit to the emergency room, Andrew was examined by Dr. Hayes for a third time.  (Dr. Hayes Notes 4/23/2002, Mot. Summ. J., Ex. G).  In the "C/O" section of his notes of the examination Dr. Hayes wrote,

> Pt stated started last week . . . [with] rash on back
> of neck was wearing a necklace -- and removed it [-]
> area has gotten bigger in two spots on back of neck.
> Pt c/o itching.  Pt also stating don't think Zoloft is
> helping.  I have had 2 reoccurrence/episodes at school
> . . . [with] anger.  I hit walls and tell sometimes.
> It takes me a long time sometimes an hour to calm down.
> I think I need a counselor.  My grades had dropped
> significantly over last several weeks.

(Id.)  Below this entry, on the side of the first page of the notes, Dr. Hayes wrote "Currently" above the terms "Zoloft 50mg" and "Tetracycline."  (Id.)  After describing a problem Andrew was

12

having with his skin, under "ASSESS/PLAN" the notes read:

A: Rash on Neck/depression

P: ↑ Zoloft 100mg qd [–] #30 × 3 refills.  Referral to
George Damous for Anger Management.  Diprolene cream
apply to affected area bid.  15 mg tube.  RTC prn.
Instructed to avoid wearing silver until area clears.

(Id.)


Andrew's final appointment with Dr. Hayes was on

February 3, 2003, a month after his eighteenth birthday.  (Dr.

Hayes Notes 2/3/2002, Mot. Summ. J., Ex. G).  The section of Dr.

Hayes' notes labeled "CC," which American General contends means

"chief complaint," reads:

1) Presents . . . [with] c/o ↑ cough × 3 days; (+)
fever (+) clear rhinorrhea[;] (+) sore throat[;] (+)
vomited brown - Ø frank blood - sm amt on Sat. Ø
heartburn Ø [illegible word][;] 2) Depression × 2
months[;] (+) broke up . . . [with] girlfriend in
[illegible word.]  Still "loves her"[;]  (+) alcohol 6
beers/weekend "till he passes out"[;] (+) joining
marines 7/03[;] States moving out of parents' house
doesn't like rules[.] ↓ appetite[;] insomnia[.]

(+) As, Bs, d/c in school[;] (+) Smokes 10/day[;] (+)
week works 35[.]

(Id.)  In the section of his notes labeled "Psych," Dr. Hayes

circled the word "Depression."  (Id.)  Next to this he wrote "Ø

SHIATT[,]" which according to American General means, "without

suicide, homicide, ideation, attempt, threat, treatment."  (Am.

Gen. Resp. to 8/13/09 Order at 5).  Next to the section of the

notes labeled "NEURO/PSYCH" Dr. Hayes wrote "(+) fidgety" and

"Occ tearful."  (Dr. Hayes Notes 2/3/2002, Mot. Summ. J., Ex. G).

Under the heading "ASSESSMENT/PLAN" the notes state,

    A: URI
       Depression/Anxiety
    P: ↑ fluids
       Z pack TAB Ø refills
       Recommended counseling - pt refuses
       Recommended starting anti-depressant - pt refuses
       ↓ alcohol - pt agrees
       Contact . . . [with] patient to call . . . [with] ↑
      ss → pt agrees[.]

(Id.)

        During its investigation of the plaintiffs' claim,

American General also received a copy of Andrew's driver's

license history.  (Driver's License History, Mot. Summ. J., Ex.

H).  The license history reveals that on November 8, 2004, prior

to signing the American General life insurance application,

Andrew was convicted of a traffic violation described as "fail to

maintain ctrl/use due care."  (Id.)[4]  No points were added to

Andrew's license as a result of the conviction.  (Id.)

        Mr. Machac reviewed the various documents received

during the claim investigation and compared them to Andrew's

application in order to "verify the questions on the

_____

        [4] The "driver's license history" does not provide a citation
to the West Virginia statute under which Andrew was convicted.
(Driver's License History, Mot. Summ. J., Ex. H).

application." (Machac Dep. at 21-22, 31, 44-45, 48, 64, Mot.
Summ. J, Ex. I.). Over the course of the investigation, Mr.
Machac periodically sent the plaintiffs letters on American
General's behalf informing them of the investigation's status.
(Machac Letter 3/4/2008, 3/18/08, 3/28/2008, 4/1/2008, 4/14/2008,
Mot. Summ. J., Ex. F). After determining that there were
discrepancies between the records received during the claim
investigation and the answers on Andrew's application, Mr. Machac
referred plaintiffs' claim to Nancy Yasso, an American General
underwriter, to determine whether the discrepancies amounted to
material misrepresentations. (Machac Dep. at 48, 63-64, 80, Mot.
Summ. J, Ex. I; Yasso Dep. at 11; Mot. Summ. J., Ex. L).

        In referring the claim to Ms. Yasso, Mr. Machac filled
out the "Claim Information" section of a document titled "AGLC
Claims Department Contestable Claim Referral Form." (Machac Dep.
at 80, Mot. Summ. J, Ex. I; Claim Referral Form, Mot. Summ. J.,
Ex. J). The "Claim Information" section of the claim referral
form contains information pertaining to Andrew's policy, and
under the heading "Information developed which was not disclosed
at the time of action indicated above" states,

        10/2001 depressed, anxiety & aggressive, take zoloft
        4/2002 current meds zoloft and hit hand against [sic]
        brickwall
        2/2003 depression 6 beers a weekend and drink until

15

> pass out, recommended counseling & starting anti-
> depressants and insured refused
> 10/2004 failure to maintain control of vehicle.
> Scuba diving in highschool.
> Please review all records received at the time of the
> claim and underwriting to determine if underwriting
> would have issued as applied for[.]

(Claim Referral Form, Mot. Summ. J., Ex. J).

Upon being referred the claim, Ms. Yasso reviewed the records received during the claim investigation and filled out the section of the claim referral form titled "Underwriting Review."  (Yasso Dep. at 81-82; Mot. Summ. J., Ex. L; Claim Referral Form, Mot. Summ. J., Ex. J).  Under the heading, "What questions on the application appear to have been answered incorrectly or incompletely, and what should the correct answers have been based on the information currently available?[,]" Ms. Yasso wrote,

> Part A Q. 17E. Should have been yes.  10/27/04 Failure
> to maintain control/use due care.
> Part BQ.7A.8 History of depression/anxiety and anger
> issues: Treated 10/22/01 depression, suicidal ideation
> Rx Zoloft.  11/28/01 depression recommended counseling.
> 4/23/02 a[n]ger hit the wall..takes along take [sic] to
> calm down.  Recommended anger management.  Rx. Zoloft.
> 2/3/03 depression 2 months. alcohol 6 beers/weekend
> till he passes out. Dx depression/anxiety recommended
> counseling-refused-recommenced starting anti-
> depressant-refused.

(Claim Referral Form, Mot. Summ. J., Ex. J).  Next to question three of the "Underwriting Review" section, Ms. Yasso noted,

16

"Would not have issued as applied for[.]"  (Id.)[5]  During her deposition, Ms. Yasso explained that if Andrew had disclosed the information contained in the medical records, and his driving history, he would not have qualified for a "preferred tobacco" rating.  (Yasso Dep. at 87; Mot. Summ. J., Ex. L).  According to Ms. Yasso, assuming the information had been disclosed, American General would not have issued Andrew a policy with $50,000 worth of coverage at a premium rate of $30.95 per month.  (Id. at 88).

After Ms. Yasso conducted her review of plaintiffs' claim, and filled out the claim referral form, Mr. Machac and his supervisor decided that the claim should be denied.  (Machac Dep. at 110, Mot. Summ. J., Ex. I).[6]  On May 1, 2008, seventy-nine days after Andrew's untimely death, Mr. Machac sent Harold White the following letter:

> We have competed our review of the information received in the course of our investigation on your claim for benefits on the above policy.
>
> This policy was issued November 25, 2006, from the application, which was completed on October 31, 2006.
>
> This policy contains an incontestability provision that provides:

_____

[5] On the copy of the claim referral form provided to the court, question three is in large part illegible.

[6] Ms. Yasso was not involved in the decision to deny the claim.  (Yasso Dep. at 79, Mot. Summ. J., Ex. L).

17

> "Except for non-payment of premiums, we will
> not contest this policy after it has been in
> force during the lifetime of the Insured for
> two years from the date of issue."

In compliance with the above provision, AIG American
General Life Insurance has conducted the standard
contestability investigation into the information
provided at the time of Mr. White's application for
life insurance.  AIG American General Life Insurance
relied on the answers given on the application as true
and factual and issued this policy as applied for.

In reviewing the information from all known sources, it
appears that Mr. White did not disclose material
information despite his affirmative answers to the
application.

Part A of the application, question 17E asks: "In the
past five years, have any proposed insureds been
charged with or convicted of driving under the
influence of alcohol or drugs or had any driving
violations?"  This question is answered in the
negative.

> Mr. White had a failure to maintain
> control/use due care violation October 27,
> 2004.

Part B of the application, question 7,A, asks, "has any
proposed insured ever been diagnosed as having been
treated for, or consulted a licensed health care
provider for:

#8 seizures, a disorder of the brain or spinal cord or
other nervous system abnormality, including a mental or
nervous disorder?  This answer [sic] was answered in
the negative.

> Mr. White had a history of depression,
> anxiety and anger management.  Mr. White was
> treated for Zoloft for his depression in 2001
> and 2002.  Mr. White was recommended to seek
> counseling & start taking anti-depressants in

2003.

> If the company had known this information at the time
> of the application, the policy would not have been
> issued as applied for.  Therefore, due to material
> misrepresentation of pertinent information on the
> application[,] we now find it necessary to rescind the
> policy, making coverage null and void from the
> inception date.
>
> Our decision is based on the facts as we know them.  If
> you have other information, which you feel may
> materially affect this decision, please submit it to us
> and we will give it every consideration.  The American
> General Life Insurance Company reserves any and all
> rights and defenses, which it has or may have under or
> in connection with this policy.
>
> A check representing a full refund of the premium paid
> will be sent to the Administrator of Mr. White's estate
> upon receipt by American General Life of a copy of
> Letters of Testamentary or Administration.

(Machac 5/1/2008 Denial Letter, Mot. Summ. J., Ex. K).

In response to the denial of their claim, on July 8, 2008, plaintiffs commenced this action in the Circuit Court of Kanawha County, West Virgina.  Plaintiffs assert the following claims in their four-count complaint: Count I, Declaratory Judgment; Count II, Breach of Contract; Count III, Unfair Claims Settlement Practices; Count IV, Tort of Outrage.  Plaintiffs seek a declaration that the policy issued by American General to Andrew is an enforceable contract; that Andrew complied with his obligations under the policy; and that American General is obligated to pay the plaintiffs benefits under the policy.  In

19

addition to declaratory relief, plaintiffs seek to recover both
compensatory and punitive damages, as well as attorney fees,
costs and pre- and post-judgment interest.

American General removed the action to this court on
August 7, 2008.  The plaintiffs are both residents of Kanawha
County, West Virginia and the defendant is a Texas corporation
with a principal place of business in Houston, Texas.  (Compl. ¶¶
1-3; Notice of Removal ¶ 12).  Because the parties are diverse,
and the amount in controversy exceeds $75,000, (Notice of Removal
¶ 4), the court is possessed of diversity jurisdiction.  See 33
U.S.C. § 1332.  The parties do not contest jurisdiction.


II.


A party is entitled to summary judgment "if the
pleadings, the discovery and disclosure materials on file, and
any affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to judgment as a
matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those
necessary to establish the elements of a party's cause of action.
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing

the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id.  The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Fed. R. Civ. P. 56(c); id. at 322-23.  A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  Anderson, 477 U.S. at 248.  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.  Overstreet v. Ky. Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th

Cir. 1995), nor make determinations of credibility.  <u>Sosebee v.</u>
<u>Murphy</u>, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party
opposing the motion is entitled to have his or her version of the
facts accepted as true and, moreover, to have all internal
conflicts resolved in his or her favor.  <u>Charbonnages de France</u>
<u>v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are
"drawn from the underlying facts . . . must be viewed in the
light most favorable to the party opposing the motion."  <u>United</u>
<u>States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).


                                III.


        Plaintiffs move for summary judgment on their
declaratory judgment claim.  According to the plaintiffs, they
are entitled to the proceeds of Andrew's life insurance policy
because the policy is a valid and enforceable contract.  (Mem. in
Supp. Partial Mot. Summ. J. at 7-8).

        American General seeks summary judgment on all of
plaintiffs' claims.  The company contends that Andrew's answer to
question 17(E) of Part A of the application, and his answers to
questions 7(A)(8), 7(F)(3) and 7(G) of Part B of the application,
constitute material misrepresentations.  In light of these

                                22

alleged material misrepresentations, American General argues that it is entitled to rescind the policy pursuant to W. Va. Code § 33-6-7. (Mem. in Supp. Mot. Summ. J. at 6-10). According to American General, because plaintiffs are not entitled to the proceeds of the policy, their claims under the West Virginia Unfair Trade Practices Act ("WVUTPA"), W. Va. Code §§ 33-11-1 through -10, fail as a matter of law. (Id. at 12). American General goes on to argue that even if the policy is not void, plaintiffs have failed to adduce any evidence that it violated the UTPA. (Id. at 12-18). American General's final contention is that plaintiffs' claim for the tort of outrage lacks the requisite evidentiary support. (Id. at 18-20).

Relying on the doctrines of estoppel and waiver, plaintiffs take the position that American General cannot rescind the policy based on Andrew's answers to questions 7(F)(3) and 7(G). (Resp. to Mot. Summ. J. at 6-11). Plaintiffs argue that Andrew's answers to questions 7(A)(8), 7(F)(3) and 7(G) were not material misrepresentations because all three questions are ambiguous and because the information sought was not material. (Id. at 11-19). While not challenging question 17(E) as ambiguous, plaintiffs assert that in no event was Andrew's 17(E) response material to the decision of American General to issue

23

the policy. (Id. at 27). According to the plaintiffs, issues of fact exists regarding whether American General violated the WVUTPA and committed the tort of outrage. (Id. at 19-38).

A. Material Misrepresentations

The West Virginia Supreme Court of Appeals has held that "[w]here an insurer seeks to avoid a policy based on a material misrepresentation, this assertion is in the nature of an affirmative defense which the insurer must prove by a preponderance of the evidence." Mass. Mut. Life Ins. Co. v. Thompson, 460 S.E.2d 719, 724 (W. Va. 1995) (quoting Syl. Pt. 7, Powell v. Time Ins. Co., 382 S.E.2d 342 (W. Va. 1981)). Setting forth "the circumstances in which an insurance policy . . . [can] be revoked for misrepresentations made in the application," Powell, 382 S.E.2d at 348 (W. Va. 1981), section 33-6-7 of the West Virginia Code provides:

> Misrepresentations, omissions, concealments of facts, and incorrect statements shall not prevent a recovery under the policy unless:
>
> (a) Fraudulent; or
>
> (b) Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or
>
> (c) The insurer in good faith would either

24

> not have issued the policy, or would not have
> issued a policy in as large an amount, or
> would not have provided coverage with respect
> to the hazard resulting in the loss, if the
> true facts had been made known to the insurer
> as required either by the application for the
> policy or otherwise.

W. Va. Code § 33-6-7.  This statute, which "was intended to
'alleviate the harshness of the common law . . . is to be
liberally construed in favor of the insured."  <u>Thompson</u>, 460
S.E.2d at 723 (quoting <u>Powell</u>, 382 S.E.2d at 343).

        For a misrepresentation in an insurance application to
be material,

> it must relate to either the acceptance of risk insured
> or to the hazard assumed by the insurer.  Materiality
> is determined by whether the insurer in good faith
> would either not have issued the policy, or would not
> have issued a policy in as large an amount, or would
> not have provided coverage with respect to the hazard
> resulting in the loss, if the true facts had been made
> known to the insurer as required by the application for
> the policy or otherwise.

<u>Id.</u> at 724 (quoting <u>Powell</u>, 382 S.E.2d at 350).  While in order
to rescind an insurance policy the misrepresentation made by the
applicant must be material, under § 33-6-7(b) and (c) the insurer
need not "prove the subjective element that an insured
specifically intended to place misrepresentations, omissions,
concealments of fact, or incorrect statements on an application
in order for the insurer to avoid the policy."  <u>Id.</u>   West

25

Virginia also adheres to "[t]he almost universal rule that . . .
there need be no causal connection between the cause of death and
the misrepresentation . . . ."  Id. at 724-25 (quoting Mut. Life
Ins. Co. v. Morairty, 178 F.2d 470, 475 (9th Cir. 1949)).  "[A]n
insurer may defend a policy claim on the ground of a
misrepresentation which caused the issuance of the policy but
with respect to which the fact or facts misrepresented were not
necessarily related to the loss sustained . . . ."  Id. at 726
(quoting S. Farm Bureau Life Ins. v. Cowger, 748 S.W.2d 332, 336
(Ark. 1988)).

1. Question 17(E) of Part A and Question 7(A)(8) of Part B

          Relying solely on the notes of Dr. Hayes, and the
emergency physician record from Saint Francis Hospital, American
General contends that Andrew should have answered question
7(A)(8) of Part B of the application in the affirmative because
he had been "diagnosed as having, been treated for, or consulted
a licensed heath care provider for" a "mental disorder."  (Mem.
in Supp. Mot. Summ. J. at 7-9).  Plaintiffs argue that because
question 7(A)(8) is ambiguous, as a matter of law Andrew's answer
thereto does not constitute a material misrepresentation.  (Mem.
in Supp. Partial Mot. Summ. J. at 10-18).

26

The West Virginia Supreme Court of Appeals has not had
occasion to consider the legal effect of ambiguous questions in
insurance applications, and has never set forth a standard by
which to judge whether questions in applications for insurance
are ambiguous.  In the context of interpreting insurance
policies, the Supreme Court of Appeals has held that "'ambiguity'
is defined as language 'reasonably susceptible to two different
meanings' or language 'of such doubtful meaning that reasonable
minds might be uncertain or disagree as to its meaning[.]'"
Payne v. Weston, 466 S.E.2d 161, 166 (W. Va. 1995) (quoting Syl.
pt. 1, in part, Shamblin v. Nationwide Mut. Ins. Co., 332 S.E.2d
639 (1985)).  "It is well settled law in West Virginia that
[ambiguous terms in] insurance contracts are to be strictly
construed against the insurance company and in favor of the
insured."  Nat'l Mut. Ins. Co. v. McMahon & Sons, Inc., 365
S.E.2d 488, 494 (1987), overruled in part on other grounds by,
Potesta v. United States Fid. & Guar. Co., 504 S.E.2d 135, 143
n.11 (W. Va. 1998)).  Where the provisions of an insurance policy
"are clear and unambiguous," however, "they are not subject to
judicial construction or interpretation . . . [and] full effect
will be given to the plain meaning intended."  Farmers Mut. Ins.
Co. v. Tucker, 576 S.E.2d 261, 266 (W. Va. 2002) (quoting Keffer
v. Prudential Ins. Co. of Am., 172 S.E.2d 714, 715 (1970)).

27

"Only if the court makes the determination that the contract cannot be given a certain and definite legal meaning, and is therefore ambiguous, can a question of *fact* be submitted to the jury as to the meaning of the contract."  <u>Payne</u>, 466 S.E.2d at 166; <u>see also</u> <u>Certain Underwriters at Lloyd's, London v. Pinnoak Res., LLC</u>, 674 S.E.2d 197, 204 (W. Va. 2008) ("The question as to whether a contract is ambiguous is a question of law to be determined by the court.").

According to one noted treatise, "[t]he same rule of construing an insurance policy or bond strongly against the insurer and favorably to the insured (contra proferentem) applies to an application as to the policy itself, the instrument having been prepared by the insurer."  3-15 APPLEMAN ON INSURANCE  § 15.9 (2d ed. 2009).  Consistent with this understanding of the law, another well regarded treatise provides,

> if the insured in good faith answers questions which
> are ambiguous, doubtful, or obscure, the
> representations will be construed in his or her favor,
> and against the insurer. If a question in an
> application is vague and ambiguous, a reasonable
> interpretation of that question by the applicant may be
> of controlling effect, and legal fraud may not be
> predicated upon an honest response based upon such
> reasonable interpretation, or at the least a jury
> question is raised as to the reasonableness of the
> insured's interpretation.

6 LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE § 81:42 (3d ed.

2009).

        In the context of interpreting insurance policies,
some courts have found the term "mental disorder" to be
ambiguous.  See e.g., Rosenthal v. Mut. Life Ins. Co. of N. Y.,
732 F. Supp. 108, 109 (S.D. Fla. 1990) ("this Court finds that
the insurance policy in the instant case is ambiguous in that
although it limits coverage for mental or nervous disorders, it
does not provide or refer to, any definition of what consitutes a
mental or nervous disorder."); see also Lutton v. Prudential Ins.
Co. of Am., 88 F. Supp. 2d 1364, 1371-73 (S.D. Fla. 2000) (noting
that in interpreting ERISA benefits plans, the Fifth and Eighth
Circuits have found "terms such as 'mental illness' or 'mental
disorder' to be unambiguous while the Seventh and Ninth Circuits
have found such terms to be ambiguous).[7]  Other courts have found
mild depression and anxiety not to constitute a "mental
disorder."  See Stewart v. Mut. of Omaha Ins. Co., 817 P.2d 44,
50 (Ariz. Ct. App. 1991) (stating "that 'mild depression and a
great deal of anxiety' . . . [can] not be characterized as a
mental or nervous disorder."); ITT Connt'l Baking Co. v. Comes,

---

        [7] See also the unpublished decision of Cothran v. Reliance
Standard Life Ins. Co., No. CA 6:98-3489-20, 1999 WL 33987897, at
*3  (D.S.C. Feb. 9, 1999) ("The Plan's 'mental disorder'
limitation is ambiguous as applied to Cothran's claim.").

302 S.E.2d 137, 139 (Ga. Ct. App. 1983) (finding that neither "mild depression and a great deal of anxiety . . . can reasonably be characterized as a mental or nervous disorder.").

Considered devoid of all context, the question of whether one suffers from a "mental disorder" is, at least to a certain extent, ambiguous.  If someone who was confined to mental institution, and diagnosed with schizophrenia, were asked whether he had ever been diagnosed with a mental disorder, the question, and requisite answer, is clear.  However, the answer to the same question posed to a person who was told by a family physician that he was suffering from "depression" after breaking up with his high school girlfriend, is not so clear.

Under West Virginia law, in interpreting insurance contracts, "the interpretation is made from the standpoint of 'a reasonable person in the insured's position.'"  Glens Falls Ins. Co. v. Smith, 617 S.E.2d 760, 772 (W. Va. 2005) (quoting Syl. Pts. 1 and 4, Soliva v. Shand, Morhan & Co., 345 S.E.2d 33 (W. Va. 1986)).  Extending this mode of interpretation to the case at hand, whether the term "mental disorder" as used in question 7(A)(8) is ambiguous depends on the position Andrew was in when he provided an answer on October 31, 2006.  The only evidence of Andrew's alleged "mental disorder" are the notes of Dr. Hayes,

30

and the fact Andrew was prescribed "Zoloft."  Dr. Hayes's notes never referred to Andrew's condition as a "mental disorder" and indeed it is unclear whether he was even qualified to make such a diagnosis.  From the notes of Dr. Hayes, and the emergency physician record, the court is unable to determine, as a matter of law, whether Andrew in fact suffered from a "mental disorder" and as such whether he was required to answer question 7(A)(8) in the affirmative.  A question of fact thus remains regarding whether Andrew had "been diagnosed as having, been treated for, or consulted a licensed health care provider for" a "mental disorder" prior to applying for the life insurance policy on October 31, 2006.

While conceding that Andrew's answer to question 17(E) was a misrepresentation, plaintiffs argue that the misrepresentation was not material.  (Mem. in Supp. Partial Mot. Summ. J. at 19-20).  Assuming arguendo that Andrew was required to answer question 7(A)(8) in the affirmative, and therefore that his answer to that question and to question 17(E) were misrepresentations, the question remains whether such misrepresentations were material.

As plaintiffs point out, Ms. Yasso testified that Andrew's failure to disclose his 2004 conviction for failure to

31

maintain control and use due care would not, on its own, "have

changed the rating of preferred."  (Yasso. Dep. at 86, Mot. Summ.

J., Ex. K).  The determination of whether misrepresentations in

an insurance application are material is not, however, to be made

in a vaccum.  American General's burden is to show that it would

not have issued the policy as applied for had "the true facts . .

. been made known to the insurer as required by the application

for the policy or otherwise."  <u>Thompson</u>, 460 S.E.2d at 724.

     According to Ms. Yasso, had Andrew disclosed the

information set forth in the medical records, as well as his 2004

conviction, "the premium he's paying for . . . [the policy] would

have given him a lesser amount . . . so he would not have gotten

the [$]50,000."  (Yasso Dep. at 83-89, Mot. Summ. J., Ex. K).  In

further support of its position that Andrew's alleged

misrepresentations were material, American General has submitted

the affidavit of Denny Blaylock.  (Blaylock Aff., Mot. Summ. J.

Ex. M).  Mr. Blaylock has been an underwriter for nearly 40 years

and is currently employed by Southern Farm Bureau Life Insurance

Company as the Vice President of New Business Administration and

Underwriting.  (<u>Id.</u> ¶ 2).  After reviewing plaintiffs' claim, Mr.

Blaylock determined that, "[t]here were significant extra

mortality concerns associated with Mr. White's depression and

anxiety." (<u>Id.</u> at 7). He concluded that,

> American General handled their underwriting and claims
> investigation responsibilities in accordance with
> generally accepted industry standards and practices.
> Had American General been aware of Mr. White's history
> of depression and anxiety at the time of underwriting,
> it is my belief that they would have fully underwritten
> Mr. White's application and issued a policy with a
> higer premium classification than Mr. White applied for
> (preferred tobacco). It is my opinion that no life
> insurance company would have issued Mr. White a policy
> with a preferred premium classification. Also, it
> would not have been uncommon for some companies to
> decline Mr. White for life insurance. Thus, the
> decision that American General made on May 1, 2008 to
> rescind the policy was proper and correct.

(<u>Id.</u> ¶ 8).

For their part, plaintiffs have submitted evidence that

American General issued life insurance policies to individuals

suffering from depression in sums greater than $50,000. Indeed,

according to plaintiffs' summary of a number of American General

life insurance policies, the company issued a $2,000,000 policy

to an insured who suffered from "mild depression," was prescribed

"Zoloft" and had a "driving violation." (Policy Summaries, Mem.

in Supp. Mot. Summ. J, Ex. P).[8] Assuming Andrew's answer to

question 7(A)(8) was a misrepresentation, and in light of

_____

[8] Exhibit P to plaintiffs' memorandum in support of their
motions for summary judgment contains a summary of 113 American
General life insurance policies. American General does not
challenge the accuracy of the summary.

plaintiffs' concession that his answer to question 17(E) was a misrepresentation, a question of fact remains as to whether these misrepresentations were material.

## 2. Questions 7(F)(3) and 7(G) of Part B

Invoking the doctrines of estoppel and waiver, plaintiffs argue that American General can not rely on Andrew's answers to questions 7(F)(3) and 7(G) in arguing for rescission of the policy inasmuch as those two question and answers were never maintained as being in issue until American General filed its motion for summary judgment on July 10, 2009.  (Resp. to Mot. Summ. J. at 6-11).  Because the court concludes that American General is estopped from asserting Andrew's answers to questions 7(F)(3) and 7(G) as the basis for rescinding the policy, the doctrine of waiver need not be considered.

Distinguishing the doctrines of waiver and estoppel, in Potesta v. United States Fidelity & Guaranty Company, the West Virginia Supreme Court of Appeals noted that "[t]he focus of estoppel . . . is on the party seeking its application . . ." 504 S.E.2d 135, 143 (W. Va. 1998).  Recognizing that "one who asserts . . . estoppel has the burden of proving it[,]" the court

34

held that,

> in order to rely on the doctrine of estoppel to prevent
> an insurer, who has previously stated one or more
> reasons for denying coverage, from asserting other,
> previously unarticulated reasons for denying coverage,
> the insured must prove that s/he was induced to act or
> to refrain from acting to her/his detriment because of
> her/his reasonable reliance on the previously stated
> grounds for declination.

Id. at 144.  As pointed out by the plaintiffs, the denial letter

sent by Mr. Machac on May 1, 2008 only references questions

7(A)(8) and 17(E).  After being presented with the denial letter

by plaintiffs' counsel during his April 15, 2009 deposition, Mr.

Machac testified:

> Q. And this is the denial letter that you sent the
> Whites?
>
> A. Yes, it is.
>
> Q. Okay.  And in this letter, did you identify every
> reason for denying the claim?
>
> A. Yes.

(Machac Dep. at 76-77, Mot. Summ. J., Ex. I).


       American General argues that in raising Andrew's

answers to questions 7(F)(3) and 7(G) as a basis for rescission

of the policy in its motion for summary judgement, "American

General has not asserted any new basis for its claims decision in

this case.  American General has simply pointed out that White's

adverse medical history of depression and anxiety was due to be

disclosed in response to multiple questions on the application.
As such, it is *literally the same grounds* for denial as has
always been the case."  (Reply to Resp. to Mot. Summ. J at 3).
This, however, is simply not the case.  Question 7(F)(3) asks
whether the insured has "been advised to have any diagnostic
test, hospitalization or treatment that was not completed?"
(Application Part B, Mot. Summ. J., Ex. A).  The information
sought through this question is distinct from the information
sought in question 7(A)(8) pertaining to whether Andrew had ever
suffered from a "mental disorder."  While in the denial letter
Mr. Machac noted that "Mr. White was recommended to seek
counseling & start taking anti-depressants in 2003," (Machac
5/1/2008 Denial Letter, Mot. Summ. J., Ex. K), the letter makes
no mention of Andrew's alleged failure to follow the
recommendation.

        Question 7(G) asks "Does any proposed insured have any
symptoms or knowledge of any other condition that is not
disclosed above?"  (Application Part B, Mot. Summ. J., Ex. A).
The denial letter does not indicate that Andrew had symptoms of a
mental disorder when he filled out Part B of the application on
October 31, 2006.  Indeed, American General has not adduced any
evidence that Andrew in fact had symptoms of a mental disorder on

that date. According to American General, because Andrew did not
disclose his alleged "mental disorder" in response to question
7(A)(8), he should have disclosed it in response to question 7(G)
as "any other condition that is not disclosed above." What
question 7(G) means by "knowledge of any other condition that is
not disclosed above," is unclear. To the extent American General
interprets the question to ask whether Andrew had "any other
condition" at the time he filled out the application, the denial
letter does not indicate that American General rescinded the
policy because Andrew was suffering from a mental disorder at the
time he filled out the application. And again, American General
has not offered any evidence that Andrew had a mental disorder on
October 31, 2006. To the extent American General contends that
applicants are required to disclose any "condition" they have
ever had in response to the question, the court finds the
question to be ambiguous. Not only is the term "condition" not
defined, to allow an insurer to rely on such a broad and
temporally unlimited question as a basis for rescission of the
policy would run counter to the requirement "that [ambiguous
terms in] insurance contracts are to be strictly construed
against the insurance company and in favor of the insured."
McMahon & Sons, Inc., 365 S.E.2d at 494 (1987).

37

American General also contends that plaintiffs cannot prove detrimental reliance on its representations regarding the grounds for rescission of the policy.  (Reply to Resp. to Mot. Summ. J. at 4- 7).  In response plaintiffs point out that they have prepared for trial, expending time and financial resources, in the belief that Andrew's answers to questions 7(A)(8) and 17(E) were the sole bases for American General's decision to rescind the policy.  (Resp. to Mot. Summ. J. at 8).  Indeed, plaintiffs note that "while sorting through 16,000 pages of underwriting produced by AIG/American General, Plaintiffs' examination was focused on the manner in which West Virginians responded to questions 7(A)(8) and 17(E) and the underwriting related thereto."  (Id.)  Plaintiffs therefore relied to their detriment on American General's representations that question 7(A)(8) and 17(E) were the sole bases for denial of their claim, and American General is estopped from asserting Andrew's answers to questions 7(F)(3) and 7(G) as grounds for rescission of the policy.  See Burns Nat's Installation Co. v. Am. Family Mut. Ins. Co., 61 S.W.3d 262 269 (Mo. 2001) ("prejudice to Burns [the insured] was beyond the mere trouble and expense of bringing suit.  For at least two years after the filing of the Petition, American Family [the insurer] identified as its defense to Burns's claim the application of work product exclusions "k" and

38

"1" of the Policy.  Burns reasonably relied on the assertion of
this specific defense by preparation to meet this issue at
trial.").[9]


B. The West Virginia Unfair Trade Practices Act


        The West Virginia Supreme Court of Appeals has held
that "there is an implied private cause of action for a violation
by an insurance company of the unfair settlement practice
provisions of [W. Va. Code § 33-11-4(9)]." Elmore v. State Farm
Mut. Auto. Ins. Co., 504 S.E.2d 893, 901 (W. Va. 1998).  In their
WVUTPA claim, plaintiffs assert that American General has
violated WVUTPA § 33-11-4(9)(c),(d),(f) and (n).  In pertinent
part, § 33-11-4(9) provides:

    Unfair claim settlement practices. -- No person shall

_____

     [9] American General argues that in light of Ms. Yasso's April
16, 2009 deposition testimony plaintiffs were on notice of its
intent to rely on question 7(F)(3) and 7(G) as grounds for
rescission of the policy.  (Reply to Resp. to Mot. Summ. J. at 6-
7).  While Ms. Yasso indicated that if Andrew did not understand
question 7(A)(8) he could have disclosed his medical history
elsewhere on the application, she did not take part in the
decision to deny Andrew's claim.  (Id. at 79, 92-93).  Ms.
Yasso's testimony that if someone does not understand that
depression is a mental disorder "then I think that they have
plenty of room to put it somewhere else," (id. at 92), did not
put the plaintiffs on notice that American General sought to
rescind the policy based on Andrew's answers to question 7(F)(3)
and 7(G).

> commit or perform with such frequency as to indicate a
> general business practice any of the following:
>
> . . .
>
> > (c) Failing to adopt and implement reasonable
> > standards for the prompt investigation of
> > claims arising under insurance policies;
> >
> > (d) Refusing to pay claims without conducting
> > a reasonable investigation based upon all
> > available information;
> >
> > (f) Not attempting in good faith to
> > effectuate prompt, fair and equitable
> > settlements of claims in which liability has
> > become reasonably clear;
> >
> > (n) Failing to promptly provide a reasonable
> > explanation of the basis in the insurance
> > policy in relation to the facts or applicable
> > law for denial of a claim or for the offer of
> > a compromise settlement[.]

W. VA. CODE § 33-11-4(9). In order to establish a cause of action
under § 33-11-4(9), the plaintiffs "must demonstrate that the
insurer (1) violated the UTPA in the handling of the claimant's
claim and (2) that the insurer committed violations of the UTPA
with such frequency as to indicate a general business practice."
Holloman v. Nationwide Mut. Ins. Co., 617 S.E.2d 816, 823 (W. Va
2005). While § 33-11-4(9) "requires more than a single isolated
violation in order to show a general business practice, a
claimant may produce sufficient evidence of this in a single
claim." Elmore, 504 S.E.2d at 902. See Dodrill v. Nationwide
Mut. Ins. Co., 491 S.E.2d 1, 12-13 (W. Va. 1997) ("separate,

40

discrete acts or omissions, each of which constitute violations
of different sub-paragraphs of W.Va. Code § 33-11-4(9), may
indeed demonstrate a "general business practice" in the handling
of a single claim, the focus of which would tend to show frequent
and rather general disregard for the several proscriptions
separately set out in the relevant statute.").

        Subsections (c),(d),(f) and (n) all require
reasonableness determinations.  The Supreme Court of Appeals has
explained "'that the reasonableness of an insurance company's
conduct [under the WVUTPA] "ordinarily is a question of fact for
the jury' that should not be determined as a matter of law by a
trial court."  Hicks ex rel. Saus v. Jones, 617 S.E.2d 457, 465
(W. Va. 2005) (internal brackets omitted) (quoting Syl. Pt. 3,
Jackson v. State Farm Mut. Auto. Ins. Co., 600 S.E.2d 346 (W. Va.
2004)).  With regard to plaintiffs contention that American
General violated §33-11-4(9)(c),(d),(f) and (n) by failing to
adopt reasonable standards for the prompt investigation of
claims, refusing to pay plaintiffs' claim without conducting a
reasonable investigation based on the available information,
failing to attempt to reach a settlement once liability became
reasonably clear, and failing to promptly provide a reasonable
explanation for denial of the claim, the court sees little reason

41

to depart from the general rule set forth in <u>Jones</u> that the reasonableness of an insurer's conduct under the WVUTPA is a question of fact for the jury.

In support of their WVUTPA claim, plaintiffs cite to W. Va. Code R. §§ 114-14-14-6.5, 14-8 and 14-6.17.  These rules were enacted by the West Virginia Insurance Commissioner in order, "to define certain practices in this state which constitute unfair methods of competition or unfair or deceptive acts or practices and to establish certain minimum standards and methods of settlements of both first-party and third-party claims."  W. Va. Code R. § 114-14-1.1(a); <u>see</u> <u>also</u> W. Va. Code §§ 33-11-4a(h) and 33-2-10.  The rules, however, do not "create[] or recognize[], either explicitly or impliedly, any new or different cause of action not otherwise recognized by law."  W. Va. Code R. § 114-14-1.1(e).  The West Virginia Supreme Court of Appeals has explained that, "a violation of an insurance regulation standing alone does not give rise to a cause of action under West Virginia Code § 33-11-4(9).  <u>Russell v. Amerisure Ins. Co.</u>, 433 S.E.2d 532, 535 n.3 (W. Va. 1993), <u>overruled in part on other grounds by</u>, <u>State ex rel. State Farm Fire & Cas. Co. v. Madden</u>, 451 S.E.2d 721, 725 (W. Va. 1984).  Recognizing that "the rules are cumulative of the robust list of section 33-11-4(9) statutory practices," in the

context of reviewing a WVUTPA claim, this court has previously declined to consider alleged rule violations "except insofar as they may inform the scope and purpose of the statutory practice at issue." Am. Safety Indem. Co. v. Stollings Trucking Co., No. 2:04-0752, 2007 WL 2220589, at *7 (S.D. W. Va. July 30, 2007).

Plaintiffs contend that in failing to provide notice in the denial letter of plaintiffs' option of contacting the West Virginia Insurance Commissioner, and in failing to provide the Insurance Commissioner's contact information, American General violated W. Va. Code R. § 114-14-6.17. Rule 114-14-6.17 does require that,

> [a]ny notice rejecting any element of a claim shall contain the identity and the claims processing address of the insurer and the claim number. The notice must state that the claimant has the option of contacting the Commissioner. The notice must provide the Commissioner's mailing address, telephone number and web site address.

W. Va. Code R. § 114-14-6.17. Plaintiffs, however, rely on this rule as the basis for a freestanding claim. Inasmuch as "a violation of an insurance regulation standing alone does not give rise to a cause of action under West Virginia Code § 33-11-4(9)," Russell v. Amerisure Ins. Co., 433 S.E.2d at 535 n.3, plaintiffs' reliance on W. Va. Code R. § 114-14-6.17 in support of their WVUTPA

43

claim is misplaced.[10]

        To summarize, material questions of fact remain as to whether American General violated W. Va. Code § 33-11-4(9)(c),(d),(f) and (n).  American General's motion for summary judgment is granted to the extent plaintiffs base their WVUTPA claim on an alleged violation of W. Va. Code R. § 114-14-6.17.


C. The Tort of Outrage


        "Intentional or reckless infliction of emotional distress, also called the "tort of outrage," is recognized in West Virginia as a separate cause of action."  Travis v. Alcon Lab., Inc., 504 S.E.2d 419, 424 (W. Va. 1998).  In order to prevail on a claim for the tort of outrage:

> It must be shown: (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and,

---

[10] It is worth noting that plaintiffs were not prejudiced by American General's failure to comply with W. Va. Code R. § 114-14-6.17 because at some point prior to April 17, 2008 they filed a complaint with the Office of the Insurance Commissioner. (4/17/2008 Insurance Commissioner Letter, Reply to Resp. to Mot. Summ. J., Ex. N).

> (4) that the emotional distress suffered by the
> plaintiff was so severe that no reasonable person could
> be expected to endure it.

Travis, 504 S.E.2d at 425.  In reviewing a claim for the tort of

outrage, "the role of the trial court is to first determine

whether the defendant's conduct may reasonably be regarded as so

extreme and outrageous as to constitute the intentional or

reckless infliction of emotional distress."  Travis, 504 S.E.2d

at 428.  In their response to American General's motion for

summary judgment plaintiffs assert that they have "delineated a

myriad of reasons why reasonable minds might conclude that

AIG/American General's conduct towards Plaintiffs was outrageous

and contemptible."  (Reply to Resp. to Mot. Summ. J. at 38).

        It cannot be said that the insurance company's denial

of a $50,000 claim for life insurance benefits here, without

more, constitutes intentional or reckless conduct "so outrageous

in character, and so extreme in degree, as to go beyond all

possible bounds of decency, and to be regarded as atrocious, and

utterly intolerable in a civilized community."  Harless v. First

Nat'l Bank in Fairmont, 289 S.E.2d 692, 693 n. 20 (W. Va. 1982)

(quoting Restatement (Second) of Torts § 46 cmt. d (1965)).

Further, plaintiffs have offered no evidence that they have

suffered emotional distress, let alone emotional distress "so

severe that no reasonable person could be expected to endure it."
<u>Travis</u>, 504 S.E.2d at 425.  To the extent American General moves
for summary judgment on plaintiffs' claim for the tort of
outrage, the motion is granted.

IV.

It is accordingly ORDERED as follows:

1.    American General is estopped from
      raising questions 7(F)(3) and 7(G) and
      the answers thereto as grounds for
      rescission of the policy.

2.    American General's motion for summary
      judgment be, and it hereby is, granted
      to the extent plaintiffs base their
      WVUTPA claim on an alleged violation of
      W. VA. CODE R. § 114-14-6.17 and to the
      extent plaintiffs seek recovery for the
      tort of outrage, and is otherwise
      denied.

3.    Plaintiffs' partial motion for summary
      judgment seeking declaratory judgment
      be, and it hereby is, granted to the

46

extent of paragraph 1. above, and is

otherwise denied.

The Clerk is directed to forward copies of this

memorandum opinion and order to all counsel of record.


DATED: August 24, 2009


John T. Copenhaver, Jr.
United States District Judge

47